PESKIN, Appellant,

v.

SEASONS HEALTH CARE LP, d.b.a. Seasons Nursing Home, et al., Appellees.

[Cite as *Peskin v. Seasons Health Care LP* (2001), 141 Ohio App.3d 436.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000367.

Decided March 9, 2001.

*Weber & Knapp Co., L.P.A.,* and *William C. Knapp,* for appellant.

*Frost & Jacobs, LLP, Scott D. Phillips* and *Jill Meyer Vollman,* for appellees Seasons Health Care LP, Western Southern Life Assurance Co., and Courtyard Nursing Care, Inc.

*Kohnen & Patton* and *Joseph L. Dilts,* for appellee Collier Nursing Services, Inc.

*Patsfall, Yeager & Pflum* and *Stephen M. Yeager,* for appellee Seasons Services, Inc.

*Lindhorst & Dreidame* and *John A. Goldberg,* for appellee James Konerman, M.D.

*Donetta D. Wiethe,* Assistant United States Attorney, for appellee Donna Shalala.

---

GORMAN, Judge.

In this appeal we are asked to decide whether the Nursing Home Patients' Bill of Rights applied to an assisted-living facility that otherwise met the statutory definition of a nursing "home" but was allowed to operate by the Department of Health without a license. Susan Peskin, the granddaughter, sponsor, and attorney for Helen Goldsmith, a resident of the facility, appeals from the trial court's ruling that the facility's unlicensed status denied her standing to bring a claim under the Patients' Bill of Rights. Goldsmith's civil suit against the facility's owner and operator, and her personal physician, included claims that she was denied the right of "adequate and appropriate medical treatment and nursing care," one of the rights expressly guaranteed in the Patients' Bill of Rights.

We hold that a facility that meets the statutory definition of "home" is subject to the Patients' Bill of Rights regardless of whether the Ohio Department of Health allows it to operate unlicensed. Accordingly, we reverse the trial court's ruling with respect to Goldsmith's claim against the facility. But, because we hold that her claim against her personal physician to be a matter of private as opposed to institutional care, we affirm the grant of summary judgment for the physician. Goldsmith's common-law claims against both parties, it should be noted, remain pending in the trial court.

## I

Goldsmith, a Medicare patient, was a resident for seven years at The Courtyard Nursing Care assisted-living facility. During this time, the assisted-living part of The Courtyard was allowed to operate by the Department of Health without a license. (In oral argument, counsel for The Courtyard proffered that the facility had since become licensed.) Collier Nursing Services, Inc. provided nurses and nursing services to the residents of The Courtyard. Dr. Konerman was Goldman's personal physician during her residency there. It is undisputed that Dr. Konerman was also the administrator of the nursing home at The Courtyard, but was not administratively involved with the assisted-living facility.

Peskin alleged that Goldsmith became drug-dependent due to the improper administration of narcotics and tranquilizers by the nursing staff. She also alleged that in May 1997 Goldsmith received inadequate medical and nursing care for an ulcer on her left leg, requiring her to be hospitalized.

In its motion for summary judgment, The Courtyard argued that it did not meet the definition of "home" in R.C. 3721.01(A)(1)(a), which is incorporated in the definition of "home" in R.C. 3721.10(A) and governs the Patients' Bill of Rights under R.C. 3721.13. That definition states the following:

" 'Home' means an institution, residence, or facility that provides, for a period of more than twenty-four hours, whether for consideration or not, accommodations to three or more unrelated individuals who are dependent upon the services of others, *including* a nursing home, residential care facility, home for the aging, and the Ohio veterans' home." (Emphasis added.) R.C. 3721.01(A)(1)(a).

## II

According to The Courtyard, the definition set forth above excludes any home or facility not licensed by the state director of health, since the four statutory examples (a nursing home, a residential care facility, a home for the aging, and a veterans' home) are all normally licensed and regulated by the state. Further, The Courtyard argues that because the Ohio Department of Health had allowed it to operate as an unlicensed facility, it was not a "home" even though it satisfied the definition in all other respects. According to The Courtyard, only the state director of health has the authority to determine whether facilities that meet the definition of a "home" under R.C. 3721.01(A)(1) are to be licensed. Without licensure, The Courtyard argues, such "homes" are not really "homes." The Courtyard further contends that the Department of Health's administrative determinations of which facilities require licensure and are therefore "homes" within the meaning of the Patients' Bill of Rights are beyond the scope of judicial review. We disagree.

When determining the meaning of a statute, a court " 'should give the words of the statute their plain meaning unless the legislative intent indicates otherwise.' " *Genaro v. Cent. Transport, Inc.* (1999), 84 Ohio St.3d 293, 300, 703 N.E.2d 782, 788, quoting *Coventry Towers, Inc. v. Strongsville* (1985), 18 Ohio St.3d 120, 122, 18 OBR 151, 152, 480 N.E.2d 412, 414; see, also, R.C. 1.42. In interpreting the Patients' Bill of Rights, therefore, we must be guided by both the language of the statute and its legislative purpose.

As noted by one writer at the time of its enactment, the Patients' Bill of Rights was considered necessary because both state and federal regulations had "largely failed to ensure humane treatment of all nursing home residents, whose special needs have often been sacrificed to administrative convenience, efficiency, and economy." Note, H.B. 600: Ohio's Bill of Rights for Nursing Homes (1980), 5 U.Dayton L.Rev. 507, 508–509. Significantly, the Department of Heath was on record as being opposed to the legislation, and its projected role as enforcer was viewed with skepticism. *Id.* at 521, fn. 90. As noted by the same writer:

"The critical position of the Department of Health in the enforcement process may pose an additional problem. Because the Department of Health controls the adjudicative and enforcement functions, it bears primary responsibility for enforcing the statute. This responsibility may be undermined by the Department's failure to respond to nursing home problems in the past. To mitigate this fear, the Department of Health has stated that although 'it did *not* * * * support [H.B. 600] as it was enacted, * * * we intend to implement and enforce it to the best of our ability.' Only time will determine whether the Department of Health conscientiously and effectively executes its responsibilities, thereby allaying skepticism respecting its role in the implementation process." *Id.*

According to the writer, the right to a private cause of action was "included in the statute specifically because those who drafted the statute distrusted the Department of Health." *Id.* at fn. 108.

The Courtyard concedes that nowhere in the definition of "home" in either R.C. 3721.01(A)(1)(a) or R.C. 3721.10(A) does the word "license" appear. As noted, The Courtyard attempts to circumvent this lack of textual support by relying upon the licensed status of the four statutory examples, as well as the director of health's enforcement responsibilities, see R.C. 3721.03, and licensing authority. According to The Courtyard, these factors combine to demonstrate the General Assembly's intent that only residents of homes required to be licensed by the Department of Health are entitled to the benefits and protection of the Patients' Bill of Rights.

We are not persuaded. By its plain terms, the statute was clearly meant to apply to any facility meeting the definition of a home, licensed or otherwise.

Indeed, further language in R.C. 3721.01(B) states that "[f]or the purposes of this chapter, any residence, institution, hotel, congregate housing project, or similar facility that meets the definition of a home under this section is such a home regardless of how the facility holds itself out to the public." While it is true that the examples given in the statute are all regularly licensed by the state, there is nothing in the language itself to suggest that the examples were meant to imply that licensure was a defining characteristic. To accept The Courtyard's argument, we would have to assume that the legislature chose to imply by example what it could have more easily made express. While the legislature is often prolix, it is rarely so deliberately obtuse.

Even more telling, however, is the fact that the statute provides eleven specific exclusions to the meaning of the word "home," with none of the exclusions making a distinction between licensed and nonlicensed facilities. The eleven exceptions to the definition of "home" are set forth in R.C. 3721.01(A)(1)(c) and incorporated in the definition of "home" in R.C. 3721.10(A)(1) for purposes of the Patients' Bill of Rights. Certainly if the General Assembly had wished to exclude all nonlicensed homes, it would have done so expressly. Indeed, the General Assembly made such a distinction in clear and unambiguous language when it excepted a "licensed" methadone treatment facility as a "home" in R.C. 3721.01(A)(1)(c)(viii).

We conclude, therefore, that the definition of "home" applies to both licensed and unlicensed facilities. The General Assembly enacted the Patients' Bill of Rights in the interest of the public health, safety, and welfare. The very name "Nursing Home Patients' *Bill of Rights*" suggests that the rights guaranteed were intended to be inherent and inalienable. Under The Courtyard's argument, patients at unlicensed facilities that otherwise meet the definition of a "home" would not be entitled to the basic protections afforded by the legislation, while those at homes that lose their license would suddenly become stripped of the protection the legislation affords. Experience dictates, however, that persons who reside in unlicensed facilities that are unregulated and unaccountable to the director of health are those most in need of private enforcement of a Patients' Bill of Rights.

Finally, we reject The Courtyard's argument that the director of health's enforcement duties and licensing authority confer upon him exclusive jurisdiction under R.C. 3721.01(A)(1)(a) to determine a "home" for purposes of the Patients' Bill of Rights. While it is true that only the director of health can issue a license, it is the duty of the courts rather than the executive authority to interpret and determine the construction of the enabling legislation. Similarly, we find no merit in The Courtyard's argument that the director of health is "in the best position to make a determination whether a facility is operating as a

home," and that such determinations are "better suited for the Director of Health and its staff of trained personnel." The statutory definition of a "home" is far from complex; in fact, it is simple in comparison to most of the legal matters courts are asked to decide.

### III

The claim against Dr. Konerman is distinguishable from Peskin's claim against The Courtyard. It is undisputed that Dr. Konerman's position as administrator of the nursing-home division of The Courtyard was unrelated to the assisted-living facility. Therefore, Dr. Konerman was not an "Administrator" as defined in R.C 3721.10(C) of the Nursing Home Patients' Bill of Rights with respect to the claim against him individually.

█ Peskin maintains, however, that there is a genuine issue of material fact relative to Goldsmith's claim against Dr. Konerman under R.C. 3721.17(I)(1). That section states that "[a]ny resident whose rights under sections 3721.10 to 3721.17 of the Revised Code are violated has a cause of action against *any person or home* committing the violation." (Emphasis added.)

█ The term "any person" as used in the statute has not been the subject of judicial interpretation, as least insofar as we can discover in the case law. Obviously this language means that a claim can be brought against individuals; however, just as the federal Bill of Rights requires state action for there to be a violation, we hold that there must be some element of institutional action underlying the alleged violation of the resident's rights. That is not to say that the action must necessarily be attributable to an employee of the institution— another patient, for example, could be the source of the violation—but there must be some causal connection or nexus that ties the violation to the facility itself.

As we noted, Dr. Konerman was the administrator of the nursing-home division of the facility, not of the assisted-living division. Any breach of his duty of professional care to Goldsmith would have arisen, therefore, out of their personal doctor-patient relationship, not Goldsmith's status as a resident of The Court-yard. We conclude, therefore, that Dr. Konerman, in his capacity as Goldman's personal physician, was not a "person" within the contemplation of R.C. 3721.17(I). We hold that the Nursing Home Patients' Bill of Rights, and specifically R.C. 3721.17(I), do not create a resident's "cause of action" for a violation by a physician acting in the capacity of the resident's personal physician. For the foregoing reasons, the trial court's judgment regarding Dr. Konerman is affirmed.

The judgment of the trial court is reversed in part as it relates to the defendants-appellees, Seasons Health Care LP, d.b.a. Seasons Nursing Home,

Western Southern Life Assurance Co., Courtyard Nursing Care, Inc., and Seasons Services, Inc., and this cause is remanded for further proceedings against these defendants in accordance with law.

*Judgment reversed in part*
*and cause remanded.*

PAINTER and WINKLER, JJ., concur.